What we did is we divided the argument into 20 minutes a side on the one case and then 10 minutes a side on the other case. You all got the order? Yes, we did, Your Honor. And, in fact, I represent Athletes First and counsel for Jen and I. Just to give Your Honors a heads up, we're going to divide it 10 each. So when it reaches, and I'd like to save one minute for rebuttal if I could. So when it reaches about nine minutes. 21. You have a clock there and it's going to start ticking and you are the master of the clock. Okay. Whenever you sit down, the clock will stop the clock as soon as you stop talking and turn away and then opposing counsel. But so long as you keep talking, the clock will keep ticking. Okay. Okay? Fair enough. There we go. Thank you, Your Honor. May it please the Court. I am Joanne Frasca, counsel for the appellant, Athletes First. And I'd like to address three compelling issues why this jury verdict must be overturned. The first reason is that the general verdict awards both compensatory and punitive damages based on a statutory unfair competition claim that was brought under Business and Professions Code, Section 17200. Now, the statute does not allow that. And for that reason, where you have an unallocated general verdict, it must be overturned. The second reason... So this was submitted to the jury on both theories? Your Honor, this was submitted to the jury based on unfair competition. And the way unfair competition was defined in the jury instructions, it had, yes, both theories, common law unfair competition and statutory. Correct. It was all in the same instruction. And this was objected to? Oh, yes. It was objected to and maybe... I don't want to exaggerate how many times. It was objected to in the proposed jury instructions. That's objected to, isn't it? Absolutely. So what... The statutory unfair competition was really not an issue in the case, was it? Well, actually, when the complaint was filed, the focus of the complaint, the second amended complaint, was RICO and trade secrets. But when those got dismissed out, it became a focus. And the part of it that became a focus was this so-called blackmail extortion. That's the common law. No, that's the statutory. It's absolutely the statutory. There's no monetary recovery at the end of that pipeline, right? Correct. Yes. Business and professions code section 7203 allows for an injunction. Right. And very limited restitution, but absolutely no recovery. That's the core of the problem that you're putting. It's precisely the problem. And, in fact, we believe that the court need go no further on this. There are many issues to be discussed, but I think that's grounds right then and there for reversal because you have this general verdict. And I can launch into that, but just to start, the two other things that I want to talk about, to divide between myself and Don, is the second issue is that the trial court erroneously instructed the jury with respect to conduct that is privileged under California law. Both by giving. The 47. Yes. Yes. Civil Code section 47, which perhaps does not come up much in federal court, but in state court it comes up all the time. And it is a very, very important privilege. You have so many California Supreme Court cases holding that the salutary or the important public policy, it's almost like a First Amendment policy, is you want parties and you want their lawyers to be able to defend against claims or bring claims zealously. And you don't want them, every time they're doing that, to look behind their back. Am I going to be subject to derivative tort liability? That has a real chilling effect. And so what the legislature has done, and what the California Supreme Court has determined in interpreting this privilege, it has interpreted it in a very broad manner. And really, if you look at Silberg, you look at Rubin, all of the cases say, if there's any doubt, the privilege applies. And when you say privilege conduct here, what's the stuff you're talking about? The pre-litigation stuff? Yes. That's what I'm talking about. That's where the client said, we'll release a warrant on you. We'll start everybody and... Well, I don't agree with that characterization. What happened was, obviously... That's what you're talking about. Yes. I'm talking about the, if you sue us, you know, you're not going to like our defenses and litigations of public forum, and this is going to come out and it's going to hurt everybody, including you. But that's what I'm talking about. What they called it during the trial was blackmail. There was a little bit of perjury. I mean, that wasn't the focus. Just a little bit. Just a little bit. Well, allegations of perjury. And by the way, we absolutely do not concede that the record supports that. But then you also have allegations concerning what's been called obstruction of justice or exfoliation of evidence or destruction of evidence. So those are the three categories. And what happened was the definition that was given to the jury of what you can consider to be unfair competition had all three of those in there, which was erroneous, and that's because they're privileged. And at the same time, the defendants requested three separate instructions on the litigation privilege. So if some of that conduct wasn't privileged but some was, we had to have an instruction on our central defense. That's a core proposition. Defendants, if there's evidence to support it, are entitled to instructions on their central defense. The standard of review here is abuse of discretion, isn't it? Well, no, Your Honor. I don't believe so with respect to everything. With respect to whether the jury was properly instructed, that's de novo. With respect to what claims were submitted to the jury, were they equitable or were they statutory, that's de novo. Really, the only- I'm talking about on this privileged conduct stuff. No, Your Honor. I don't believe it's abuse of discretion on failing to give an instruction. But before you had the instruction, you had the evidence. Well, the evidence-it's not a question of the evidence being admissible. This is not an evidentiary privilege. This is a liability privilege. So we're not saying the evidence couldn't have come in. The court ruled that the evidence was admissible. Yes, and we don't disagree with that. So you think the evidence was admissible? Well, here's what happened. We filed a-I think- You think it's admissible? You agree it's admissible? No. I think that with the trial court-we filed, in fact, a motion in limine ahead of time to exclude all of it but under Rule 408, the settlement statute. And the court granted it. And so we thought that was correct. But what happened was then when the trial occurred, the plaintiff was allowed to put on this evidence and the defendant wasn't. And that was absolutely erroneous. Okay, well, that's something else. I've got- Okay, I'm just- Maybe I'm not understanding. On the evidence that we're talking about that you say involved privilege conduct, the original decision to admit it was if that's reviewable for an abuse of discretion. Well- The court seems to have understood-well, the court was told what the law is and then made a decision that it didn't fall inside of it. No, I don't think that's what happened at all. What happened was the evidence either was going to all come in or not come in. It was our position initially it should not. And, in fact, we were successful. Our motion in limine was granted. Okay. But then it started to come in. And- And you objected. No. We said if this is coming in, we want to tell our side of the story. That was blocked. And that is an abuse of discretion review, that part. But the second part is we said, okay, you can't have this conduct being the basis for tort liability. So your instruction on what tort liability-excuse me, what is unfair competition, we objected to. Now, whether or not that instruction is erroneous, that's a de novo review. And whether or not- I'm just trying to hear you. So you did agree that the evidence was admissible for some purpose? If the evidence-well, for example, let me say this. There was some allegation that some of the player declarations were perjurious, for example. Now, that can't be the basis for tort liability. But the whole purpose of the privilege is at trial, let's get to the truth. Okay? So they can come in and the other side is entitled to say, well, you know, that's not true and your credibility is not good. And we can say, no, no, no, that was true. So there's nothing wrong with admitting it. I'm hearing you say we were willing to fight it out on a level playing field, but the judge didn't give you a level playing field. Exactly. The deck was sacked against us from the start. I'm not clear on what is common law unfair competition and what is statutory. Unfair competition. Statutory dealt with passing off, things of that sort? Correct, Your Honor. Common law unfair competition has been very narrowly defined as either passing off and then it's been widened a little bit to involve misappropriation. Common law is passing off? Passing off is common law and misappropriation. What is statutory is any unlawful, fraudulent or unfair conduct. That's the statutory part. And it's really easy in this case because you have a binding pretrial conference order that separates them. The plaintiffs did that. They said, here's our common law claim and that's the misappropriation part. And over here is our statutory claim and that's that misappropriation plus things that are statutory. Extortion, suborning perjury and obstruction of justice. That's the statutory claim. And that's the one that, A, there's absolutely no right to a jury. B, you cannot award damages of any kind, punitive or compensatory. And that, the error, the fundamental error here is that when you look at the jury instruction, it says, SMB's unfair competition claim is comprised of, and it lists six things. Three of them are statutory unfair competition. So that, right there, you have reversible error. Because you have being submitted to the jury and the jury being, In fact, the trial court at the post-trial motions said, I made a mistake. There was an error in this instruction. But? But the court said, well, I think it's a harmless error because if the jury had awarded less, I would have fixed that when the statutory claim came to me. And there's two problems with that. The first problem is the punitive component. If the jury was not given that part of the claim and did not award punitive, the trial court can't do that on the statutory claim because the statutory claim does not support punitive. That's $20 million with respect to athlete first. The second problem with that is that the trial court could not award damages. He can't say, well, if those damages weren't enough, I'll up the damages. The only thing that the trial court could do is either grant an injunction or he could consider restitution. But in this case, there was no basis in the record because there was no evidence of restitution. The entire damages testimony of their expert rouser focused on damages. And I think the Korea Supply case really answers the but. And that is you can't take damages and say, okay, well, I didn't get those. I'm going to just take the same thing and I'm going to call them restitution and get that. The statutory unfair competition claim does not exist to allow a party to recover damages for the wrongful conduct. That's not what you're talking about. I'm sorry. Well, the second I've talked an awful lot about unfair competition with respect to privilege. I just want to briefly say that the problem was that we did not have any instructions on privilege. So if the court, if you take their argument and they say, well, this part wasn't privileged and this part wasn't, that's irrelevant. If some of it was, we had to be instructed. And then finally, our last argument is to damages. I think we've adequately briefed. And I better quickly get down so opposing counsel has some time and maybe we'll have a minute for rebuttal or not. Thank you, Your Honors. Okay. Good morning, Your Honors. Laura Sullivan on behalf of David Dunn. May it please the Court, for Dunn, the errors in this case go even further than the errors that were briefed in Athlete's First Appeal. The heart of the case against Dunn was always for breach of non-competition agreements. This verdict must be reversed because the district court didn't instruct the jury that non-competes are invalid in California. And again, since we have a general verdict that doesn't allocate damages, it's impossible to determine how many damages were awarded on the basis of non-competes that the plaintiff now admits are invalid. There was not just one non-compete in this case, as SMD would like this court to believe. There were five. And regarding all but one, SMD must concede on appeal they were invalid. Does the invalidity apply to what can be done during the term of the contract? Or does California law disinvalidate non-competes following the termination of the contract? And I think it's right to start at that one little piece, because that's the only piece of the whole non-competition theory that SMD claims, you know, that they even have an argument for. But this notion that the restrictive covenants were enforceable even after Dunn quit because that's what his term was in the contract, that's specific performance. That violates Civil Code 3390. No personal services contract can be specifically enforced, period. And saying that he can't go out and compete or if he does, the money belongs to them, that's the same as saying, oh, he's forced to come into our offices and work every day. And clearly, that wouldn't be permitted. When the argument was made that you say goes nowhere, and you made this objection, what did the district court say as to why it was permitting these contracts to go without such an instruction? The court didn't say definitively other than I will not give your instruction. The instruction that we proposed was not that there can't be a contract for a fixed term that's enforceable. It was, you know, if you want to say that Mr. Dunn left, that caused you damage or you had to look for another employee, fine. Try that case for breach of contract, but you can't tie damages to these specific duties of I will, you know, use my best efforts for you and all the clients I represent will nurture your benefit and that money all belongs to you because those damages aren't recoverable, not only because it's specific performance, but because under 16600, you know, that's a non-compete and it doesn't work. Did the other side argue that the violation of the non-compete post-performance was evidence of something that the jury ought to take into consideration? No, what they argued, you know, was exactly the theory that because, in fact, they even called it a purported resignation. I mean, their theory was he still works for us. He can't quit. We bought him for five years. We own you, David Dunn. That was the argument, and the district court apparently accepted it. And there are, you know, comments here and there in the record where, you know, when I was asking for instructions, not just with regard to Mr. Dunn's non-compete, there were two others against the at-will employee. We had this broad proprietary information and inventions agreement, which broadly restricted any employee at Athletes First that Brian Murphy, Toby Brannan, Aaron Bornstedt from, you know, representing any SMV clients. They're going to say we weren't asking for damages because he violated some invalid non-compete contract. We were asking for damages because he did things that he wasn't permitted to do according to our relationship. Is that what they're going to say? That's what they will say. That's not what they did say. There was one damages witness in this case. His name was Gordon Rouser, and Professor Rouser purported to give this opinion of SMV's all-time loss in value. It was a permanent figure, and SMV will admit that Rouser didn't accommodate for the fact that David Dunn was contractually entitled to quit at the end of 2004. And why was he? Because, again, SMV was arguing we have this overarching assignment agreement, and David Dunn, for the rest of your life, if you ever represent a formal client of ours, that money belongs to us. So there was no limitation of damage whatsoever, and the jury was instructed to compensate fully for the loss on the contract claim. You've got other issues you want to talk about? Punitive damages, Your Honor. They warrant particular attention in this case. SMV didn't even try to put forward evidence of ability to pay. There was no evidence of Dunn's assets at the time of trial. There was no evidence at all of his liabilities. Under California law, that's enough that the award must be vacated, but if Your Honors are even inclined to look further, there are a host of other reasons that that damages award must be vacated. It's the result of Rouser's improper testimony. It invaded the province of the jury. Rouser misled the jury because he didn't consider Dunn's ability to pay, and it certainly influenced this jury. You generally don't think the district judge did a good job here, huh? I'm sorry? You generally don't think the district judge did a good job here. I think from the beginning to the end of trial that this man did not get a fair shake. I mean, we had hearsay objections being sustained from the beginning to the end of trial, to the admissions coming out of the plaintiff's own mouth, to the verbal acts. These defendants are being charged with solicitation, and we can't say exactly what we said to the athletes or the employees or what they said to us. It's impossible to defend, and I think the district court, yes, I think he pulled the rug from the defendant from the moment they walked in the courtroom. So if Your Honors are not inclined to grant judgment as a matter of law for the reasons that I've urged in the brief, I think that at a minimum, David Dunn is required to do his job. Thank you. Okay. We're going to stop for the talk. I'd like to. You will co-counsel? There are two minutes left. You can find it out between there. So which one gets how much of the two minutes? Are you going to be handing it over? Yes, Your Honor, I am. My name is Thomas Peterson, and I represent Steinberg, Morag, and Dunn. Let me start with the contract issue, unless the court would like me to go to a different place. And let's be clear about what the breach of contract was. It's described in the closing argument as the simplest of claims. He had a five-year term employment contract, which contained a best efforts promise and a further promise that he would devote substantially all of his time on behalf of our client in doing his work, and he was concededly in the evidence to be a superstar of the sports industry. The breach in this case was not a breach of a post five-year term restrictive covenant. The breach in this case was a breach of a best efforts promise. And I will add, there were covenants in the case which included restrictions on his ability to do things like solicit employees, which in California is also enforceable without regard to a term contract. But even as to clients and things like that, where there is this 16-600 provision of California's business and professions code, during the five-year term of his contract, those restrictions are nothing more than the mirror image of his best efforts promise to work on our behalf. And that's for five years? The five-year term, which was ending December 31st, 2004, Your Honor. And let's assume they breached the contract and quit. The jury found he did, yes. Then the damages for the five years? Let me explain how the damages worked, all right? You have a lot of generalization, and I think you have to look at what Professor Rausser did. What he did was he said, look, what happened in this case is they walked off with this very valuable football recruiting business, and they impaired the basketball business that my client had. What I'm entitled to do, under the law, is to evaluate what was the thing they took in 2001 and left. What was that worth? And there's authority in this circuit, which we've cited, and an opinion of Judge Aldous Hertz, and the Third Circuit, which we've cited, that states that the loss of the value is a legitimate measure of damage in this circumstance. So, what Professor Rausser did is he said, look, I know what this company was worth by a real-world transaction, because in 1999, the Asante Corporation, a completely independent third party, came along and bought SMD. I know what the earnings of SMD were in that transaction two years before Dunn left. I can calculate a ratio, 10.1, and what I can then do is take that ratio and apply it so that I can figure out what was the revenue that went out the door when Dunn breached his contract and set up his competing shop, and that produces the resulting damage. And what he did is he gave a range. And perhaps the most interesting of the numbers he gave, given the jury's final decision of $20 million awarded against Athletes First and $2 million as to Dunn, is he performed the following calculation. He said, I'll take my 10.1 multiplier and I'll apply it to the actual revenue that the departing Athletes First company where Dunn went earned, and that produced $21.5 million in departing revenue. It was a way of evaluating what had been taken. Now, conceivably by capitalizing it, perhaps it's true that you could say that, you know, that takes into account a future stream of revenue, and it certainly takes into account the five years. Does it take into account a term a bit after? Perhaps, but there's nothing illegal about that for a couple of reasons. Let's remember that the kind of contracts we're talking about in this case provided that if you negotiated the contract, a 10-year contract for a player, you got a payment every year for the whole 10 years. That's a loss that's attributable to this breach outside the term. Moreover, you know, there's a factor of destroying the loyalty that that customer used to have to our business and the like. So, in other words, the mere fact that there might be some, you know, And that was your argument to the district court. I beg your pardon, Your Honor? That was your argument to the district court. Well, Your Honor, they didn't make a motion in the district court on the basis that this damage study was improper on that ground. They made it on a causation ground, Your Honor, and the district judge admitted the testimony, and it's a Daubert kind of review about whether it's admissible, I think. They wanted instructions under California law these non-compete agreements are invalid, and you're saying that's not what we're saying. This case isn't about them. And the other thing I want to emphasize is the instruction they proposed was wrong, because the instruction they proposed said it was a sleepingly broad instruction, and it said the only protection is extended to confidential information. That's not correct insofar as we're talking about the ability to solicit employees. And it's also an inadequate instruction because it doesn't take any account of the term period, which is important, because here, again, the other nuance to it is the jury found that Dunn was a unique and valuable employee, and so under California law, civil code section 3423E, as in Edward, these kinds of provisions to restrain someone from going elsewhere or collect damages from them are perfectly enforceable in those distinctive circumstances. The next argument that was made is there's something wrong with punitive damages because there was, quote, no evidence admitted on the part of Dunn's ability to pay. Wrong. Let me just walk you through it. Professor Rausser specifically testified about Mr. Dunn's net worth based upon the evidence of it which had been produced, which was fragmentary because there had been some obstruction during discovery, AFSER 722. And let me show you. Now, he also testified about the assets the gentleman had, you know, his bank account and the like. But the crucial thing which you have to keep in mind is that part of his net worth is his Athletes First investment. He owned 78% of Athletes First. And what Rausser testified to was that Athletes First had in his view a value of $76 million, AFSER 779. 78% of that asset is a $58 million asset. Now, they've made the accusation here that there was no evidence of liability in the case. There were balance sheets for the year 2001 that were prepared by Athletes First. Now, Professor Rausser said there were all sorts of problems with them and they were incredible in many respects, but they lifted the liabilities at $433,000. So, you can do a quick calculation and say that he's got this hugely valuable asset and there was an account of liabilities based upon that evidence. That's the chain we had. And we had a situation where there had been destruction of evidence by this Mr. Honeywell who destroyed Athletes First files including those specifically labeled DUN files. And it was also a situation where we'd encountered some stonewalling in the discovery process. Now, they tell you in their reply brief that Judge Liu ruled that we got all the documents we asked for. In response to a motion eliminated had nothing to do with this. So, it's hardly a comment by the court on that subject. So, there's adequate evidence of wealth in this record to support punitive damages. Let me add, the jury instruction given in this case to which there was no objection does not mention wealth. It talks about financial condition. Let me also add, there was no Rule 50A motion challenging the sufficiency of the proof of wealth. So, if there was a problem with it, we had no opportunity to come in and address the subject. You say there was no objection to the jury instruction, but there had been requests to charge which were denied. I'm talking about punitive damages, Your Honor. I'm just dealing right now with Judge Trott's direction to me to deal with this proof of wealth question. And I think I've covered the highlights as to that. Let me just also make clear, as I say, the contract which is enforced in this case, we're talking about his employment agreement and the provisions of that and the attachments to it. There are some other agreements quoting in the case. They aren't argued. There's no suggestion that we're trying to enforce some covenants in those agreements. I beg your pardon? What about the unfair competition claim? Let me turn to that next, Your Honor. First, what got tried? Under Beacon Theaters versus, let's go back to the complaint. The complaint pleads both statutory unfair competition under 17200 and it pleads common law unfair competition. And it pleads it in a way as to encompass all of the five theories that the jury was told about. You have the proceeding order, so you can talk all you want. All right, Your Honor. Let me get to the pretrial order. We have a pretrial order. What the pretrial order said was that it classified, it described that claim, the statutory claim, as including these three claims, the extortion, the subordination of perjury, and the spoilation of evidence. Thereafter, however, the case was, you know, this is also, let me just give you the context. You know, we're living in Beacon Theaters versus Westover. We have to have a trial before the court, which is going to take up both the legal and the equitable issues in the case. So we have a trial, which, of course, first is directed at the things that the jury is going to consider, and then subsequently the district judge will turn to 17200, which is what he ultimately did when he made those comments and said that I don't find it necessary to grant any further relief to that statutory claim, because I think you've already received, by way of the damages, all of the relief that I would have been inclined to give you by way of injunction. The key point, though, Your Honor, going back to the pretrial order is, at the trial of this case, and most importantly when we get to the instruction stage, these claims are not carved out in any fashion as being exclusively claims under the statutory cause of action. The only reference to the statutory cause of action in the jury instruction that the jury gets is in A.F.S.E.R. 2287, and it simply defines extortion as, quote, extortion falls within the ambit of unfair business practices forbidden by California's statutory and common law prohibitions on unfair competition. There was no objection at the jury's instruction stage to the instructions on extortion on the basis that there was any violation of a pretrial order. That's the only place this one reference, again... It's not as if there was an objection otherwise. I beg your pardon? You're not saying there was no objection. There was no objection because there wasn't. No, this issue doesn't, this issue does not, this case is tried, as they say, it's tried in a universal way, but it's always been clear in the trial of the case that the extortion issue was going to be tried, and when it comes time to submit that issue, there's no objection on the basis that it's only a statutory claim to the form of submission that we have. So my point to you is, I understand the rules about the superseding effect of a pretrial order, but when you have a case where the conduct of the trial is such that the originally pleaded claim gets tried, and when there's no objection given to the district judge to say this violates your pretrial order, and hence no opportunity for us, for example, to come in and say, well, your honor, we'd like to be relieved from it, you know, it's simply a classification of where these claims lie, and, you know, it shouldn't have a binding effect. These are claims which are permissible under the common law. In those circumstances, it's inappropriate to suggest that this court should now reverse a seven-week jury trial on the basis that there was a statement in a pretrial order, and a case that was then tried on a fundamentally different basis. So I don't think that offers any basis by which to do a reversal, and then there's some other things to keep in mind about that, too. Did Judge Lew say he made a mistake? He did. He did. What he did is he said, your honor, that he thought that he wished he had, he would have changed the instruction, the instruction that I read to you, which is what he was referring to, that he wished he had that back, in effect, and could have changed it. Presumably what he would have done is he simply would have deleted the reference to statutory in the definition of extortion. But, you know, it's a truthful statement in the instruction, and it doesn't tell the jury to do anything with respect to that fact, and moreover, let's be clear, the jury only addressed the subject of damages, so it didn't take into account anything else. In fact, there was a specific instruction the jury was given that for purposes of calculating the recovery in the case, pardon me, that it could not and should not consider any evidence of unjust enrichment. It had heard some evidence about that. Unjust enrichment is the kind of thing that starts to bring us within the statutory violation in California. So, again, there was no, this has no impact in the context of the way the case was tried, but you're quite right, Your Honor, he did express a wish that he would have given a different instruction. And there's another reason why, getting back to the question Judge Kosinski put to me, that the failure to object to that instruction is important, because if the judge had been alerted to the fact that it was somehow going to mislead people, or more importantly, that this issue shouldn't be submitted because there had been a pretrial order that had narrowed the subject, that would have had an effect. Now, they did argue, and this goes to a question Judge Sand put to opposing counsel, they did argue that the common law cause of action only covers so-called palming off, because Your Honor had asked about defining the proper scope of the claim. Now, that argument of theirs is based on a piece of dictum by the California Supreme Court in an insurance coverage case, and it's demonstrably been overtaken by some subsequent things. First, there are two decisions of this court that hold that the common law cause of action for misappropriation reaches the misappropriation of property, such as is alleged, the misappropriation of confidential information, such as is alleged in this case. And then the second thing to keep in mind about the scope of the common law claim is that the California Supreme Court has held many years ago, and California courts of appeal have held thereafter in cases we canvassed for you in the brief, that the whole idea of common law unfair competition is to make sure that there is no- And the kind of conduct we're talking about in this case falls within that category, which brings me to the question of privilege. The litigation privilege, it simply doesn't apply to what we're talking about in this case. I mean, you've heard a lot about litigation privilege today, and obviously now have two cases dealing with it. I mean, the first, it's almost a perverse application, because the application that you're being urged in this- It's not perverse. Well, I- That doesn't help you any. Your Honor, let me- It's a lie, cheat, or steal privilege. Let me- And that's the nature of it, so that's not going to help you any. Well, the only point I was trying to make, Your Honor, is the justification for it is that we want to protect access and participation in court. In this case, the allegation is that starting with the Neal memo- I'd like to talk about justification, not just look at what it says. All right, Your Honor. So, why is this exactly covered by what it says? It doesn't apply to pre-litigation- It doesn't satisfy the elements. Let's cut to the chase. The Supreme Court of California said it does apply to pre-litigation. Your Honor, yes, but- So, why did you say contrary? I'm sorry. It can apply to pre-litigation conduct, but you have to satisfy certain elements in order to do it. And what I meant to say was, here they don't satisfy the required elements for purposes of this statute. What they don't do is they don't show that these things have a reasonable relationship to the object of the litigation and are functionally designed to achieve a result that can be obtained in litigation. What these threats were designed to do, which is where I was trying to go with my sort of perverse thing- I'll smear you and make sure that your reputation is smeared. What's not covered by that? The privilege, Your Honor, does not extend to threats that- In other words, there is still-the California Court of Appeal has told us in the Rothman case- there is still a value in protecting people from being subjected to threats which have no reasonable relationship to the litigation. In other words, you simply can't run around and say, I am tortuously threatening you, as in this case, or trying to destroy your business. And if you go to court, I will throw forth all sorts of information about salacious personal details that has no- Why is that not a reasonable relationship to the litigation? Wasn't one of the claims of the defendant that Steinberg's conduct made continuing not a good alternative? So what's the standard for reasonable relationship to the litigation? The standard, Your Honor, requires that there be both some connection and logical relation to the action, and also that the communicated act further as a necessary and useful step in the litigation purpose and must serve its purposes. Where did you get this? This I'm getting, Your Honor, from two California Court of Appeal cases that we cited. The Cassian, which is 98 Calat 4th, and I have a jump site at 920. And the Rothman case, which is 49 Calat 4th at 1146. In other words, the California courts have not said that the privilege sanctions you to- The question at least came out the wrong way for you. It did, Your Honor. I'm just- Any case that came out the right way for you? Yes. The Rothman case, which talks about the circumstances in which there was a- This involved this- Michael Jackson was being accused, and he went to the press- Can you recite it again, please? I'm sorry, Your Honor. Recite for Rothman. The Rothman case- I have the jump site here. It's 49 Calat 4th, 1146. The full site is in our brief. I don't know that I have it. Wait a minute. I actually have the case here with me. It's 49 Calat 4th, 1134, 1996 decision of-written by Justice Kroski here at the Court of Appeal. Before you go away, I have a couple of questions about the exclusion of evidence. As far as I understand this case, Assange bought SMD, and Dunn says that there was additional consideration in connection with the five-year employment term that was never delivered, thus excluding his performance under the contract. And we're told that you were allowed to get your side of the evidence in on that, and the other side wasn't allowed to get a whole bunch of evidence in that was relevant on that. What's your response? Not right, Your Honor. They were permitted to-the judge sustained some hearsay objections on some specific questions which were designed to get some evidence that somebody agreeing with something that Dunn had effectively said. They got into evidence, his version of the contract, which was before the jury when it had to decide as it did under the instructions whether or not a contract had been validly formed. In addition, with respect to those vignettes that they talk about, the evidence came in, in fact, in other ways. For example, there are specific e-mails that- So are you saying that it was an error, but it was harmless because the evidence came in other ways? I'm saying that even if we assume that the Court shouldn't have sustained all of the hearsay objections- Let's not assume that. Let's try to decide. All right. Your Honor, I have the impression that perhaps some of the hearsay objections went a little further than the hearsay rule would normally permit, which would require you then to make an assessment of whether or not there was any prejudice resulting from the exclusion. But I hear you artfully saying there were some mistakes here in the exclusion of evidence. Well, we've just tried not to take a position one way or another. But, yeah, under frank questioning, if I thought I could defend you to hearsay questions, I would have done it in my brief. But I think it doesn't matter- I noted you didn't try to. That's why I'm pushing you. All right, Your Honor. No, it doesn't matter because the evidence came in. It came in both because Mr. Dunn fully described his arrangement, that is, his version of this $2 million stock deal, and, moreover, it also came in by way of documentary evidence, which specifically does some of the things he complains he couldn't do. Namely, it shows that Mr. Weinberg, for example, of Asante, is, you know, purporting to tell him to, you know, take a leap of faith and trust me. These emails that went in also show that Ms. Wurzman, the general counsel, is supposedly preparing these documents, which is another thing he wanted to get across. These emails also show that Mr. Steinberg was apparently very upset about it. And let me make one other point, too. Going back to the question, apart from prejudice, did this have any legitimate role in the case? I mean, we actually made a motion, which the trial court denied, we think erroneously, to exclude this whole line of inquiry under the parole evidence rule because what he was claiming, in effect, was, as a sophisticated contract fellow, I had integrated contract. I knew that I believed I had these promises for additional consideration, which weren't specified in it, and I nevertheless signed it, and now I'd like to testify that even though these contracts, both the employment agreement and this extension addendum, meticulously recite the consideration that they are either wrong in characterizing when I would get my stock or else that there's still more stock that I'm entitled to receive. In any event, I notice that I've rather considerably... Thank you, counsel. I'm only going to make two quick points because I don't want to keep taking up my counsel's time. As far as unfair competition, what case was tried? Was it just unfair competition, common law unfair competition? Absolutely not. From the get-go, the plaintiffs took the position they had a right to a jury trial on the statutory claim, and if there's any doubt in the proposed PRO order that plaintiffs got the court to issue after the verdict was rendered but before the judgment was entered, I would refer the court to AFASER 2808, and in that, the plaintiffs say that we recovered damages on the following claims. They list them. One of them is statutory unfair competition, B&P 17200. There's no doubt that that was submitted to the jury. Secondly, with respect to the privilege, the Rossman case that counsel cites is important for two reasons. First of all, it recognizes that where a defendant wants to avoid liability and they make statements in settlement, that is a legitimate object of litigation. And secondly, it notes that 47D, which was a statute at that time was being enacted and is enacted now, that covers giving copies of pleadings or republishing their content. Inferior evidence is not a substitute for persuasive evidence. You're talking about punitive damages? No. What are you talking about? I would like to... Details, you know, context before... The claim that the evidence that was wrongfully excluded did not prejudice Dunn because, in fact, cumulative evidence got in. Here is what plaintiffs doesn't even claim got in. There are two key pieces of evidence. The one is Dunn's explanation of why he signed that side letter. The side letter was this document that was faxed to him at 2 in the morning that memorialized the promise of stock, but it came five years later instead of the immediate stock that Marty Weiberg orally promised him. And, nevertheless, Dunn signed it, and SMD asked the jury to infer that because he signed it, he agreed to forego that upfront stock. Well, David Dunn had a very different explanation that the jury never heard, and that was that he signed because of the incredible pressure put on him at 2 in the morning by Lee Steinberg and Marty Weinberg and Anita Wardson. They said the merger is about to be announced in a matter of hours, and this merger will not go through if you don't sign David Dunn, and your partners, Lee Steinberg and Jeff Morad, will not walk away with $74 million tomorrow, and it will be your fault because you didn't trust us. That would have been highly persuasive to this jury, and SMD doesn't even claim that the jury heard anything close, nor did it hear the explanation of why that upfront stock promise wasn't put in writing. David Dunn would have testified, as we proffered, that Marty Weinberg told him, I don't have time under SEC regulations to convene a board of directors meeting, and I need that meeting in order to spend more stock on this deal, so that's why we can't put that promise in writing before the merger. David Dunn believed him, but, again, the jury didn't hear it, and, otherwise, there was no apparent explanation for why this couldn't be put in writing because, remember, the jury knew that at least three law firms were working on this deal. They're drafting agreements in the middle of the night, and, naturally, the jury would think, well, why couldn't they put the upfront stock promise in writing? The other side says plenty of evidence of ability on Dunn's part to pay. Seventy-eight percent of Athletes First's work, which was worth $76 million, is about $58 million, only $400,000 in liability, tons of evidence of ability to pay. Ability to pay at the time of trial is the relevant inquiry. David Dunn's 78 percent interest at the time of trial was in an insolvent company that had lost $3.3 million since the time of investment, which is what the plaintiff was getting their number from. They said, you know, the company must be worth a large amount because investor platinum loaned you, you know, a certain amount of money for a 5 percent interest. Was there a 50-A challenge? The jury instructions accurately told the jury to consider defendant's financial conditions. So, from our perspective, the jury instructions were proper, and we're not challenging the jury instructions. It's just that because plaintiff failed its burden to put forward confident evidence, that the jury came out with an outrageous number. Was there evidence in the record establishing the insolvency of the company? Yes. And that's cited in, if it's not Dunn's reply brief, it's athlete's first reply brief. It's AFSER 781 to 782. And notwithstanding, there was no, you know, conclusive evidence of liability. So, on either end, you just don't get net worth. And net worth, you know, imagined at the time of investment. Okay, thank you. We'll deal with the platinum case now. Thank you for your attention. Thank you very much. Let me, I think perhaps a good place to start with respect to the platinum case is to talk about the point that I think makes the bridge most easily, and that's the cause of action for conspiracy that the district court granted summary judgment on as to platinum in this case. Because, obviously, it dovetails quite closely with all of the other issues that you've just been thinking about in the context of this case. It's the district judge granted summary judgment on the cause of action for conspiracy here for two reasons. The first one is he determined that there wasn't a, that he didn't think there was a separate cause of action that had been established as to platinum. Of course, there wouldn't be a reason not to permit the cause of action for conspiracy, which is, after all, a jointer device. And second, he decided that there wasn't enough evidence to show that platinum had joined into any kind of an agreement to become part of a conspiracy. And just to give you the full context. Because a conspiracy is what? Well, a conspiracy is an agreement to achieve, to come together with an, for purposes of achieving an illegal object. An illegal object. That's correct, Your Honor. Yeah. And so let me just, as I say, I think for purposes of thinking about this. And conspiracy is a good framework for doing this because I think a lot of the same factual analysis is at issue for purposes of all of these claims. The evidence that they were pursuing an illegal object. Yes. As opposed to some kind of an interesting business deal. All right. The evidence is, Your Honor, that, let me take what I think is the best of it. The best of it is that they participated directly in the plan to disseminate the, and knew about, and knew the purpose of, at least I think a jury could infer from the evidence. The plan to destroy Steinberg in particular and disseminate information about him. Who is they and precisely what do you mean by participated? All right, Your Honor. There's a lot of abstraction. I apologize. The evidence shows that when they were contemplating making the investment in this case, that Mr. Antoine of Platinum, their lawyer, Mr. Cochran Bond, who was supposed to be doing some investigation, sat down with Mr. Sawyer, who was Mr. Gunn's attorney. In that conversation, the evidence of that conversation in the record is that at that time they were told that the Athletes First founding group had a lot of dirt about Steinberg and that he could never allow this dirt to come out. And this was told to them in the context of helping them understand why it was that there was not going to be an injunction or litigation action which was going to shut down and deter this investment that they were being induced to make. Is that, that's the words? We got a lot of dirt against this person? That's right. It's not necessarily illegal. I mean, I hear that stuff in lawsuits all the time. They're never going to possibly sue us because to do so, all of this stuff's going to come out. They won't want to have any part of that. But, Your Honor, I think the evidence of that it's a question for the jury to be entitled to consider what is the significance of these notes and admissions that have been made about this conversation having taken place. And so, we have a very clear evidence, to which we then add that thereafter they invested in the enterprise, and most importantly for this purpose, when it came time to find a way to facilitate the dissemination of all of the material that we know, and there's evidence of some of that very salacious material having come out because we have in the record the article that Mr. Cimer of the Los Angeles Times writes, which includes some of it. That when it came then to implement that program, and thus confirming the character of this dirt, that it was Platinum that hired the Fleischman-Hillard public relations firm, which was their long-time public relations experts, paid them, and most importantly, there's evidence, there's an e-mail, it's conceded it's in the case, they dispute the significance of it, but there's an e-mail that says that Platinum is going to be in charge of directing the activities of the firm. And there's also evidence in the record that it was Fleischman-Hillard who were the very people who fed to Cimer and to others this information, which was, it was essentially, Your Honor, the completion, the implementation of the program, which we contend was set in motion going all the way back to the beginning at the time of this Neal memo. So, I think if you take that set of facts and you add to it the fact that there undoubtedly has been an agreement, I mean, there are formal agreements, and then the question is of whether those agreements reach a further level of unlawful object, and that, of course, were permitted to prove without concrete evidence, were permitted to infer that, or at least ask the jury to conclude it from circumstantial evidence, I think there's enough evidence here that a jury could conclude that Platinum conspired to participate in the tortious conduct that's at issue in this case. And I think, and as I say, I think that same analysis that I've just given you factually provides a basis for holding them responsible directly on these tort claims that we've been talking about with respect to the other case, the interference claims, and the unfair competition claims. And let me just briefly address this Tadisha case, which has been much featured in the briefing. I think what we have to understand is that it is quite clear from the Tadisha case that the fact that I am a director or officer doesn't give me any license or immunity if I participate in intentionally tortious conduct. And we're contending that that's what happened, such as through this vignette that I've described, and also because they, for example, actually used confidential information, which one could reasonably conclude from the record that they knew had been obtained improperly from my clients. Well, no, Your Honor, it's a little different. Platinum actually participated in the implementation of the extortion plan. According to the evidence, they not only hired, but they directed the activities of the company that implemented it. So that ought to be enough. All right. Let me just briefly comment on the other evidence, because I think the evidence actually goes across the board on the theories. There is also evidence of their use of the financial information that we have obtained, and I guess I've covered that. Let me just shift over for a minute then to the other part of Tadisha. The other part of Tadisha, I think, says that in certain circumstances, that if you are an investor, I'm sorry, an officer or a shareholder or a director, that your buying into the enterprise ought to be good enough for purposes of establishing liability as well. And as to that, their principle defense here is that there's no control and there was an advice of counsel defense. Well, I think the existence of advice of counsel defense factually is a serious issue in this case, because the lawyer they hired conceded that he only spent 2.9 hours investigating this and operated on the assumption that he believed everything he was told and was given the limited warrant of determining whether or not it was possible there would be an injunction that would lie at the beginning of the transaction. With respect to control, all I ask you to consider there is it's got to mean something other than a numbers game. The evidence here is that platinum was the absolutely crucial element of making this enterprise fly and had all sorts of controls over it, including various controls having to do with the salaries that would be paid to the 78% owner, Mr. Dunn. And again, we're talking about a summary judgment standard. So perhaps I'll save what time I have left unless you have a question for me. Thank you. Good afternoon. I'm cool. I'm going to please the court. Platinum was sued for investing in athletes first. Excuse me. That's all it was ever uncovered in discovery. The case was therefore properly dismissed. At the summary judgment stage. It's the same reason, same basis for supporting platinum's claim for attorney's fees that the court, we would argue, views as discretion in denying. If summary judgment means anything, if Rule 56 means anything, summary judgment was properly granted in this case. The plaintiff needs to come forward with sufficiently probative evidence to establish each element, at least one of the claims. S&D never did that in this case. If you take it a step further, what platinum did is they invested and S&D makes the point, well, platinum was very important. Their money, maybe this company couldn't have existed further without platinum's money. That's an immaterial fact. Venture capitalists put money into companies all the time that might not exist. What about the presentation made by counsel that there's enough here of a conspiracy? Your client hired the PR firm that was involved in smearing people, and they knew up front that this was going to go on. Let me address that. There's both a factual hurdle and legal hurdle to that. The factual hurdle is they talk about one phone conversation where Mr. Cochran Bond is talking to Mr. Sawyer, and the subject of it is the litigation risk. They're talking about what is the likelihood of success in litigation. As part of that, it's mentioned, as Your Honor mentioned, they might not even sue. There's dirt here. That's the standard evidence. They want to take that evidence and say somehow platinum knew of threats of extortion, of a conspiracy. That's all they have. They then say, well, platinum was involved in hiring the PR agent. Well, what is it that, first of all, the evidence is clear that all platinum did was guarantee payment. The e-mail they referenced, there was testimony to that that's unrefuted, that platinum had no involvement in the litigation support provided by Fleischman & Hilliard. All they did was guarantee payment for Fleischman & Hilliard? They guaranteed the payment for the fees that Fleischman & Hilliard would incur. By the way, Fleischman & Hilliard was not the longtime PR firm for platinum. It's not really relevant except that that's one of the reasons Fleischman & Hilliard might want that confirmation from platinum. They had just entered into that relationship, and Athletes First said, we could use some PR help. Could you help us find a PR firm or could we use your PR firm? And platinum made the introduction. In fact, the initial meeting had nothing to do with litigation privilege or the litigation work that Fleischman & Hilliard was going to do, but the subject naturally came up and it delved into a discussion of that. At that point, platinum had no involvement in what Athletes First did with Fleischman & Hilliard. So what is the case that they have against platinum? What have they put forward from an evidentiary standpoint that they could get a jury verdict on? They mentioned this extortion, this conspiracy. Well, extortion, you need the threat. You need the evidence that the defendant knew the threat. There's no evidence that platinum knew of any of these alleged threats going on between Athletes First and SMD. What they knew is they had a conversation with Mr. Cochran Bond, and they were told in addition to what the litigation risk might be, they might never sue. That's not knowledge of any threat. That happens in almost any business negotiation where litigation might be pending. So what do you have to demonstrate in order to be eligible for fees? What we have to demonstrate is that the claim was under 3426.4 objectively specious, which means not quite frivolous. It might have had some facial appeal, but when you look beneath it, there's nothing to the claim. There's no merit. And then there was subjective misconduct, bad faith, which can be inferred from the objective speciousness of the claim. You don't like their inferences. They don't like your inferences. Well, here's where I start with. Judge Liu made a ruling where he found that they did not establish one element of the trade secret claim against platinum. In fact, he threw out the whole trade secret claim against all the parties, including Athletes First, and, of course, platinum is one step removed from that. In making that finding under the Gemini case and the other cases cited, the claim is objectively specious. So Judge Liu was simply wrong in interpreting that case. So once it's objectively specious, the court may infer that there was bad faith. Now, why do you think it's objectively specious? Because it was complete failure of evidence. Not one element of the claim. They couldn't even prove they had trade secrets. They couldn't prove that they kept them confidential. There's some broader concept, trade information. There was information pertaining to the clients and their wishes. Why is that a trade secret? Well, the one example they cite, a couple athletes have a desire to go in the entertainment business. I would submit that that's something that an agent would have a duty to publicize. You must go out and find entertainment opportunities. That's not a trade secret. Well, that's your view, so what? Why does your view matter? The important thing is that they thought this was information they got from their clients, and they chose not to publicize it. They think this is something that they would not want to share. Isn't that the major trade secret? Well, no, it has to be an independent economic value for not being known. And they never showed that, and that's what Judge Liu found. There's a large gap between something that's specious and a claim that fails. Well, in this case, you can also look at the other parts of that. How did Judge Liu look at this? Did he see that this was specious? He found it not to be specious, no. Is that entitled to some kind of respect? You've got the trial judge sitting there ruling on this thing, and he says, I'm ruling against it, but it's not specious. Well, I think he misinterpreted the Gemini case, the California case on point, that said when you have a complete failure of proof, the claim is objectively specious. So I think on that point, he didn't have a choice. And once he made it, he created the record. He found the record. They did not prove one element of the trade secret claim. And the claim in which Platinum essentially would only be derived from this. All losing cases are necessarily specious. No, but when you have a summary judgment case, when they lose in every element of the claim, they can't establish one element of the claim. The Gemini case actually was not even summary judgment. That case got to trial, and in the trial, the plaintiff dismissed the trade secret claim. And the court found that still to be objectively specious. And in the Stillwell case, which is a young reporting case that's discussed significantly in Gemini, it was a directed verdict at trial. So here we have a summary judgment case. I think the case law has developed with Gemini that when you do have a dismissal at summary judgment, none of the elements are proven. That's objectively specious. So always in every case where none of the elements are proved, necessarily you have a specious situation on your hands and fees are allowed. No, under the trade secret statute. There's a specific statute we're dealing with for trade secrets. And it's important because if a business or individual is accused of taking trade secrets, it's a serious allegation. And so we have a statute specifically for trade secrets, and the law has developed. So if your question was for trade secret case, my answer is yes. If it's objectively specious when it's dismissed in the manner that the Plattons case was. I'm still not sure Judge Lew was right in dismissing it. You haven't said that yet. That case is still before us, right? Yes, yes. Well, in regards to the evidence that... You know, the case you have to make out of this is when, maybe this is something in their case, a split of that. When they walk off and start this new business and take the client list, and all the information that the business has gathered about the clients and their preferences and their goals and desires, their personal information, all that stuff, that's not a trade secret. That's public. It's a pure say. It's not a trade secret. I don't quite see it. Well, they also have to show that Platton had some involvement, that the Platton had direct participation in that. They can't just say that Platton... That's how you get rid of the conspiracy, the conspiracy against Platton. But Platton, as an investor, under the cases that they cite, it's not enough to even show that they even knew. They had to have direct participation or be in a position where they're actually directing it because they're in control. So you're agreeing that there were trade secrets? No, I'm not agreeing that there's trade secrets, John. I'm saying that even if you do assert that there are trade secrets here, you have to show that Platton had some direct participation, active participation in the misappropriation, in the tort that's being committed. And they have not shown that. Now, I would also say they have not shown trade secrets because the information that they cite to, this customer information, client information, NFLPA website has information, all kinds of information on players, for agents. Agents can access it. Members of the public may not be able to. And the only information they cite to, they argue for an appeal, is one, this investor information, which is the business information. Well, the district court, they acknowledge that Platton's use of that was not a violation of trade secret status. Then they cite the client data. The only thing they cite to is what your Honor mentioned was the entertainment aspirations of these two athletes. They don't give any other evidence of Platton having knowledge, having received any of that, having any active participation in any misappropriation by athletes first. They're missing key elements of their case. And that's why we went into discussion of the attorney's fee. Okay, thank you. I'll come. Thank you. You'll save the better part of a minute and 20 seconds. The fee award is reviewed for abuse of discretion. The order that he refers to, they prepared and the judge just signed it. There's no basis for an abuse of discretion. And even if you get past objective speciousness, it's up to the judge to infer with bad faith whether he wants to or not. With respect to the trade secret point and the requirement he asserted, my colleague asserted about whether or not there was a, they have to take the trade secret. In the IMAX case 152 F3rd at page 1170, this court points out that essentially what you have to show when you get the information, and he's talking about confidential information, same standard for trade secret, is that you knew or should have known that the information was secret. We're not just talking about publicly available price information. We're talking about specific customer preferences. We're talking about the confidential phone numbers that they copied so they could get a head start in getting it, getting the venture started. And we are also talking about information about internal cost projections that they use for projecting the business and that athletes first use for doing its performance. I appreciate the course. Thank you. Any other cases? Just argue, stand submitted, and we are adjourned. All rise. Court is in session 10-start. Court is adjourned.
judges: Kozinski, Trott, Sand